# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AARON L. BROWN, PETER A. YOUNG,  )
NINA DANIEL, RUSSELL S. CRABTREE, )
KIMBERLY L. NESBITT and ERIN N.    )
WHEELER, individually and on behalf of all )
others similarly situated,            )
                                 )
                Plaintiff,   )
      v.                         )
                                 )
THE MITRE CORPORATION, THE     )
BOARD OF TRUSTEES OF THE MITRE  )
CORPORATION, THE INVESTMENT   )
ADVISORY COMMITTEE OF THE     )
MITRE CORPORATION and JOHN DOES )
1-30,                             )
                                 )
               Defendants.  )

**CIVIL ACTION NO.:**

**CLASS ACTION COMPLAINT**

Plaintiffs, Aaron L. Brown, Peter A. Young, Nina Daniel, Russell S. Crabtree, Kimberly L. Nesbitt and Erin N. Wheeler ("Plaintiffs"), by and through their attorneys, by and through his attorneys, on behalf of the MITRE Corporation Tax Sheltered Annuity Plan ("TSA Plan") and the Qualified Retirement Plan ("QRP Plan") with TSA and QRP being referred to collectively as the "Plans,"[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries, which include the MITRE Corporation ("MITRE" or "Company") and the

---

[1] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

Board of Trustees of MITRE Corporation and its members during the Class Period[2] ("Board") and the Investment Advisory Committee of the MITRE Corporation and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] The Class Period, as will be discussed in more detail below, is defined as June 22, 2016 through the date of judgment.

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.      Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

9.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

10.     At all times during the Class Period, the QRP Plan had at least $1.6 billion dollars in assets under management.  At the end of 2020 and 2019, the QRP Plan had over $2.4 billion dollars and $2.2 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the MITRE Corporation Qualified Retirement Plan ("2020 QRP Auditor Report") at 8. At all times during the Class Period, the TSA Plan had at least $1.9 billion dollars in assets under management. At the end of 2020 and 2019, the TSA Plan had over $4.5 billion dollars and $4.1 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The December 31, 2020 Report of Independent Auditor of the MITRE Corporation Tax Sheltered Annuity Plan ("2020 TSA Auditor Report") at 7.

11.     The Plans' assets under management qualifies them as jumbo plans in the defined contribution plan marketplace, and among the largest plans in the United States.

12.     The Plans are also large in terms of the number of its participants.  From 2016 to 2020, the QRP had between 10,798 and 12,366 participants with account balances.  During the same time period, the TSA had between 14,190 and 12,225 participants with account balances.  So combined, the Plans had between 23,164 and 26,415 participants with account balances.  For comparison, according to information derived from ERISApedia.com's database, a service that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there were only 198 defined contribution plans (401k, 401a, and 403b) in the country with 15,000 to 19,999 participants with account balances.  For plans with 20,000 to 29,999 participants with account balances there were only 194 of such plans.

13.     As jumbo plans, both in terms of assets and participants, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants'

investments.  The Plan's massive size in terms of the number of participants also afforded it the luxury to leverage its scale to obtain low recordkeeping and administration costs.

14.      Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, failing to control the Plans' administrative and recordkeeping costs ("RKA" costs).

15.      Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and its participants millions of dollars.

16.      Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.   JURISDICTION AND VENUE

17.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

18.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

19.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant

to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.   PARTIES

**Plaintiffs**

20.     Plaintiff, Aaron Brown ("Brown"), resides in Colorado Springs, Colorado. During his employment, Plaintiff Brown participated in the QRP Plan investing in the options offered by the QRP Plan and was subject to the excessive administration and recordkeeping costs (defined above as RKA costs) which were, in part, charged as a fee against all investments in the Plans, as discussed below. Specifically, Plaintiff Brown invested in the TIAA-CREF 2045 Lifecycle fund which throughout the Class Period was subject to an asset-based fee used to pay for excessive RKA charges as discussed below.  For example, in 2020, the TIAA-CREF 2045 Lifecycle Fund was subject to a 39 basis point fee, a fee which was charged against all assets in the Plans. Plaintiff Brown suffered injury to his Plan account by overpaying for his share of administration and recordkeeping costs. Although, Plaintiff Brown invested in the QRP Plan, but both Plans are managed in an identical fashion, have identical managers and have identical Trustees. In fact, MITRE itself portrays both Plans as being a single plan in reality. The Summary Plan Description which is applicable to both Plans, has an all-encompassing term for both Plans, namely, "[t]he MITRE Corporation Retirement Program." The MITRE Corporation Retirement Program, Summary Plan Description, Effective January 1, 2020 ("SPD") at 1. The SPD goes on to confirm that the Plans had identical managers, recordkeepers, trustees and sponsors. SPD at 4.

21.     Plaintiff, Peter A. Young ("Young"), resides in Mechanicsburg, Pennsylvania. During his employment, Plaintiff Young participated in the Plans investing in the options offered by the Plans and was subject to the excessive administration and recordkeeping costs which were, in part, charged as a fee against all investments in the Plans, as discussed below. Specifically,

Plaintiff Young invested in both the QRP Plan and the TSA Plan. As of March 2019, Plaintiff Young invested in 24 separately identifiable funds in the QRP Plan and 26 separately identifiable funds in the TSA Plan all of which, throughout the Class Period, were subject to an asset-based fee used to pay for the already excessive RKA charges, discussed below. All 50 of these funds were subject to the 39 basis point charge in 2019 and 2020 a fee which was charged against all assets in the Plan, as discussed in more detail below. To identify a few of these funds, Plaintiff Young was invested in, but not limited to, the Amana Growth Institutional fund, the Fidelity Large Cap Value ENH Index fund and the Fidelity Emerging Markets fund. Plaintiff Young suffered injury to his Plan account by overpaying for his share of administration and recordkeeping costs. In addition, Plaintiff Young was invested in the Fidelity Emerging Markets fund which is one of the many funds that paid revenue sharing above the basis point fee charge applied to each fund, as discussed below. Plaintiff Young suffered further injury to his account by having to pay this additional amount of revenue sharing on top of the already excessive per fund basis point charge.

22.     Plaintiff, Nina Daniel ("Daniel"), resides in McLean, Virginia. During her employment, Plaintiff Daniel participated in the Plans investing in the options offered by the Plans and was subject to the excessive administration and recordkeeping costs which were, in part, charged as a fee against all investments in the Plans, as discussed below. Specifically, Plaintiff Daniel invested in both the QRP Plan and the TSA Plan. As of March 2018, Plaintiff Daniel invested in 12 separately identifiable funds in the QRP Plan and 7 separately identifiable funds in the TSA Plan all of which, throughout the Class Period, were subject to an asset based fee used to pay for the already excessive RKA charges, discussed below. All 19 of these funds were subject to the 39 basis point charge in 2018 through, at least, 2020, a fee which was charged against all assets in the Plans, as discussed in more detail below. To identify a few of these funds, Plaintiff Daniel was invested in, but not limited to, the Fidelity Freedom Index 2030 Investor fund, the Fidelity Real Estate Investor and the Fidelity Small Cap Discovery fund. Plaintiff Daniel suffered

injury to her Plan account by overpaying for her share of administration and recordkeeping costs. In addition, the Fidelity Freedom 2030 K fund is one of the many funds that paid revenue sharing above the basis point fee charge applied to each fund, as discussed below. Plaintiff Daniel suffered further injury to her account by having to pay this additional amount of revenue sharing on top of the already excessive per fund basis point charge.

23.    Plaintiff, Russell S. Crabtree ("Crabtree"), resides in Leavenworth, Kansas. During his employment, Plaintiff Crabtree participated in the Plans investing in the options offered by the Plans and was subject to the excessive administration and recordkeeping costs which were, in part, charged as a fee against all investments in the Plans, as discussed below. Specifically, Plaintiff Crabtree invested in both the QRP Plan and the TSA Plan. As of March 2018, Plaintiff Crabtree invested in 3 separately identifiable funds in the QRP Plan and 2 separately identifiable funds in the TSA Plan all of which, throughout the Class Period, were subject to an asset based fee used to pay for the already excessive RKA charges, discussed below. All 5 of these funds were subject to the 39 basis point charge in 2018 through, at least, 2020, a fee which was charged against all assets in the Plan, as discussed in more detail below. To identify a few of these funds, Plaintiff Crabtree was invested in, but not limited to, the Fidelity Puritan K fund, MetLife Fixed fund and the Fidelity Freedom 2020 K fund. Plaintiff Crabtree suffered injury to his Plan account by overpaying for his share of administration and recordkeeping costs. In addition, the Fidelity Freedom 2020 K fund is one of the many funds that paid revenue sharing above the basis point fee charge applied to each fund, as discussed below. Plaintiff Crabtree suffered further injury to her account by having to pay this additional amount of revenue sharing on top of the already excessive per fund basis point charge.

24.    Plaintiff, Kimberly L. Nesbitt ("Nesbitt"), resides in Lovettsville, Virginia. During her employment, Plaintiff Nesbitt participated in the Plans investing in the options offered by the Plans and was subject to the excessive administration and recordkeeping costs which were, in part,

charged as a fee against all investments in the Plans, as discussed below. Specifically, Plaintiff Crabtree invested in both the QRP Plan and the TSA Plan. As of March 2018, Plaintiff Nesbitt invested in approximately 15 separately identifiable funds in the QRP Plan and 15 separately identifiable funds in the TSA Plan all of which, throughout the Class Period, were subject to an asset based fee used to pay for the already excessive RKA charges, discussed below. All 30 of these funds were subject to the 39 basis point charge in 2018 through, at least, 2020, a fee which was charged against all assets in the Plan, as discussed in more detail below. To identify a few of these funds, Plaintiff Nesbitt was invested in, but not limited to, the TIAA-CREF Mid-Cap Value Institutional fund, the TIAA-CREF Real Estate Securities Institutional and the TIAA-CREF Enhanced International Equity Index Institutional fund. Plaintiff Nesbitt suffered injury to his Plan account by overpaying for his share of administration and recordkeeping costs.

25.     Plaintiff, Erin N. Wheeler ("Wheeler"), resides in Bowie, Maryland. During her employment, Plaintiff Wheeler participated in the Plans investing in the options offered by the Plans and was subject to the excessive administration and recordkeeping costs which were, in part, charged as a fee against all investments in the Plans, as discussed below. Specifically, Plaintiff Wheeler invested in both the QRP Plan and the TSA Plan. As of March 2018, Plaintiff Wheeler invested in 4 separately identifiable funds in the QRP Plan and 4 separately identifiable funds in the TSA Plan all of which, throughout the Class Period, were subject to an asset based fee used to pay for the already excessive RKA charges, discussed below. All 8 of these funds were subject to the 39 basis point charge in 2018 through, at least, 2020, a fee which was charged against all assets in the Plan, as discussed in more detail below. To identify a few of these funds, Plaintiff Wheeler was invested in, but not limited to, the Fidelity Small Cap Stock fund, Fidelity Mid Cap Stock K fund and the Fidelity Multi Asset Index fund. Plaintiff Wheeler suffered injury to her Plan account by overpaying for her share of administration and recordkeeping costs.

26.     Plaintiffs have standing to bring this action on behalf of the Plans because they participated in the Plans and were injured by Defendants' unlawful conduct.  From at least 2015, preceding the start of the Class Period, to at least 2020, there was an unreasonably high revenue requirement to pay for RKA costs that was tacked onto the Plans' funds in the form of an increased expense ratio.  *See* Appendix A[4].  This increased ratio ranged from .10 basis points in 2015 to .039 basis points in 2020.  Each of the Plaintiffs were invested in funds that had this tacked-on expense ratio that was unreasonably high.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein, which is mainly allowing for unreasonably high RKA costs to be charged to Plan participants. [5]

27.     Plaintiffs did not have knowledge of all material facts (including, among other things, total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

---

[4] Appendix A is a list of all funds in the Plans from 2015 to 2020. The excessive expense ratio was applied to each and every fund in the Plans from 2015 to, at least, 2020. Appendix A was compiled by using the supplementary schedules attached to both the QRP Auditor Report and the TSA Auditor Report from 2015 through 2020. As shown in Appendix A, in 2015, there were more than 150 funds in the QRP Plan and more than 250 funds in the TSA Plan. Similar results are seen for 2016 through 2020.

[5] Plaintiff Brown previously filed an action against Defendants for similar claims that was dismissed for lack of subject matter jurisdiction.  *See Brown v. The Mitre Corp et al.*, No. 1:21-cv-11605.  The instant complaint cures the pleading deficiencies of the prior complaint by alleging facts satisfying Article III standing requirements.  *See Pace v. Town of Erving*, 294 F.Supp. 3d 5, 8 (D. Mass. 2018) ("The basic rule that dismissal for lack of subject-matter jurisdiction does not preclude a second action on the same claim is well settled. This means only that dismissal for lack of subject matter jurisdiction permits a second action on the same claim that corrects the deficiency found in the first action.")

28.     MITRE is the sponsor of the Plans and a named fiduciary of both the QRP Plan and the TSA Plan with a principal place of business being 202 Burlington Road, Bedford, Massachusetts.   The December 31, 2020 Form 5500 of the MITRE Corporation Qualified Retirement Plan filed with the United States Department of Labor ("2020 QRP Form 5500") at 1 and The December 31, 2020 Form 5500 of the MITRE Corporation Tax Sheltered Annuity Plan filed with the United States Department of Labor ("2020 TSA Form 5500") at 1. MITRE describes itself as a not-for-profit organization which works on the public interest across federal, state, and local governments, as well as industry and academia.[6] MITRE operates federally funded research and development centers ("FFRDC's"), which assist the United States government with scientific research and analysis, development, and acquisition, and has an independent research program. *Id.* MITRE has over 8,200 employees.

29.     MITRE appointed the Investment Advisory Committee of the MITRE Corporation ("Committee") to, among other things, ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2020 QRP Auditor Report at 10 and the 2020 TSA Auditor Report at 9. As detailed in each respective Auditor Report, "[t]he Investment Advisory Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance." *Id*. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

30.     Accordingly, MITRE during the putative Class Period is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

---

[6] See, https://www.mitre.org/about/corporate-overview last accessed on September 20, 2021.

31.     For the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

32.     MITRE, acting through its Board of Trustees, appointed the Investment Advisory Committee of the MITRE Corporation ("Committee") to, among other things, ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2020 QRP Auditor Report at 10 and the 2020 TSA Auditor Report at 9. As detailed in each respective Auditor Report, "[t]he Investment Advisory Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance." *Id*. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

33.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

34.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

35.     A discussed above, MITRE and the Board appointed the Committee to, among other things, ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. 2020 QRP Auditor Report at 10 and the 2020 TSA Auditor Report at 9. As detailed in each respective Auditor Report, "[t]he Investment Advisory Committee determines the appropriateness of the Plan's

investment offerings and monitors investment performance." *Id.* As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

36.    The Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plans assets.

37.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

38.    To the extent that there are additional officers, employees and/or contractors of MITRE who are/were fiduciaries of the Plans during the Class Period, or were hired as investment manager(s) for the Plans during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, MITRE officers, employees and/or contractors who are/were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   CLASS ACTION ALLEGATIONS

39.    Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plans, at any time between June 22, 2016 through the date of judgment (the "Class Period").

------

[7] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

40.     The members of the Class are so numerous that joinder of all members is impractical.  The 2020 QRP Form 5500 lists 12,366 Plan "participants with account balances as of the end of the plan year."  2020 QRP Form 5500 at 2. The 2020 TSA Form 5500 lists 12,225 Plan "participants with account balances as of the end of the plan year."  2020 TSA Form 5500 at 2.

41.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiff participated in the Plans and has suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated the Plaintiff consistently with other Class members and managed the Plans as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

42.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

     A.     Whether Defendants are/were fiduciaries of the Plans;

     B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

     C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

     D.     The proper form of equitable and injunctive relief; and

     E.     The proper measure of monetary relief.

43.     Plaintiffs will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

44.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

45.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLANS

46.     The Plans, collectively referred to as the "MITRE Retirement Program" in the SPD, are "defined contribution" plans within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34). The TSA is intended to qualify under Section 403(b) of the Internal Revenue Code, and the QRP is intended to qualify under Section 401(a) of the Internal Revenue Code. The Plans became effective on August 1, 1981 and are maintained by MITRE. Employees of MITRE (excluding co-op, seasonal, temporary, on-call, leased, and MITRE global employees) are eligible to participate in the Plans. SPD at 1.

47.     The Plans are "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provide for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The 2020 QRP Auditor Report at 10 and the 2020 TSA Auditor Report at 9.  Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.  *Id.*

### Eligibility

48.     In general, regular full-time employees are eligible to participate in the Plans. *Id*.

### Contributions

49.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

50.     With regard to employee contributions in the TSA Plan: "participants may make contributions to the Plan subject to certain Internal Revenue Service ('IRS') limitations." 2020 TSA Auditor Report at 10. MITRE will make matching contributions to the TSA Plan on behalf of its employee based on a three-tier structure involving the total amount contributed by the employee. *Id.* Under the QRP Plan, employees are not required to make contributions but, instead, MITRE makes all contribution on their behalf. 2020 QRP Auditor Report at 10.

51.     Like other companies that sponsor 401(k) plans for their employees, MITRE enjoys both direct and indirect benefits by providing matching contributions to the Plans' participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at

the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

52.     MITRE also benefits in other ways from the Plans' matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

53.     Given the size of the Plans, MITRE likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

54.     With regard to contributions made by participants to the Plans: "…contributions are immediately vested." 2020 QRP Auditor Report at 11 and 2020 TSA Auditor Report at 10.

### *The Plans' Investments*

55.     In theory, the Committee determines the appropriateness of the Plans' investment offerings and monitors investment performance. 2020 QRP Auditor Report at 10 and 2020 TSA Auditor Report at 9. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

56.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

57.     The QRP Plan's assets under management for all funds as of December 31, 2020 was $2,491,873,696.  2020 QRP Auditor Report at 8. The TSA Plan's assets under management for all funds as of December 31, 2020 was $4,545,351,415.  2020 TSA Auditor Report at 7.

*Payment of Plan Expenses*

58.     During the Class Period, administrative expenses were paid for using the Plans assets. As described in the 2020 Auditor Reports: "[m]anagement fees and record-keeping costs are paid by the Plan …"  2020 QRP Auditor Report at 12 and 2020 TSA Auditor Report at 12.

**VI.     THE PLANS' FEES DURING THE CLASS PERIOD WERE UNREASONABLE**

    A.     **The Totality of the Circumstances Demonstrates that the Plans' Fiduciaries Failed to Administer the Plans in a Prudent Manner**

59.     As described in the "Parties" section above, Defendants were fiduciaries of the Plans.

60.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for monitoring the Plans' fees, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.") In fact, in an attempt to discover the details of the Plans' mis-management, on February 15, 2021, Plaintiff Brown wrote to MITRE requesting, *inter alia*, meeting minutes from the Committee. By Letter dated, April 1, 2021, MITRE denied Mr. Brown's request for these meeting minutes.

61.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to

investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

62.   For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding Defendants' decision-making processes based upon the numerous factors set forth below.

63.   Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plans and the assets of participants.

### B. Defendants Failed to Adequately Monitor the Plans' Administrative and Recordkeeping Expenses

64.    A clear indication of Defendants' imprudent fee monitoring process was the excessive recordkeeping and administrative fees (defined above as RKA costs) Plan participants were required to pay during the Class Period.

65.   The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."   Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein.

66.   There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plans).  First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Recordkeeping;

B. Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

C. Administrative services related to converting a plan from one recordkeeper to another;

D. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

E. Maintenance of an employer stock fund (if needed);

F. Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

G. Plan consulting services, including assistance in selecting the investment lineup offered to participants;

H. Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[8] (excluding the separate fee charged by an independent third-party auditor);

I. Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

J. Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

---

[8]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

67.     This suite of essential recordkeeping services can be referred to as "Bundled" services.  These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

68.     The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  These A La Carte services typically include, but are not limited to, the following:

> A.  Loan processing;
>
> B.  Brokerage services/account maintenance (if offered by the plan);
>
> C.  Distribution services; and
>
> D.  Processing of qualified domestic relations orders.

69.     All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.  That is exactly the case here where, MITRE executed a Record Keeping Services Agreement ("Agreement") with TIAA to provide recordkeeping for the Plans and also an agreement with Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") on March 23, 1999 which included managed account services.

70.     The Agreement was entered into prior to the start of the Class Period on April 8, 2006. Under the terms of the Agreement, TIAA provides recordkeeping services based on a percentage of the assets in the Plans. The annual revenue required for services is referred to as the "Revenue Requirement."

71.     In 2015 the Revenue Requirement was 0.10 basis points of total Plan assets, in 2016 the percentage was .07 basis points of total assets and from 2018 through at least 2020, that percentage was .039 basis points.  The most recent amendment to the Record Keeping Services Agreement states the Revenue Requirement of .039% "will remain in effect for a five (5) year period beginning July 1, 2018 (ending June 30, 2023)."  Amendment No. 11 to the Record Keeping Services Agreement.

72.     The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[9]  Thus, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant.  Because of economies of scale, large plans get lower effective rates per participant than smaller plans.  Plans with 5,000 participants or more can obtain much lower rates per participant than a plan with 500 participants.

73.     Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In

---

[9] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

74.     In  addition,  while  it  may  not  be  *per se*  imprudent  for  a  plan  to  have  two recordkeepers, here it seems that it had disastrous effects on participants retirement savings. It's difficult to understand how the Plans could take advantage of its economies of scale to get the best possible  record-keeping  fees  when  it  continues  to  utilize  two  recordkeepers,  a  job  which  is traditionally  handled  by  only  one.  Given  the  Plans'  high  recordkeeping  fees  during  the  Class Period, as will be discussed in more detail below, it would have been prudent for the Defendants, to reduce the recordkeepers for the Plans to only one. This should have been done, at the least, from the beginning of the Class Period if not much sooner.

75.     Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3.  Otherwise, as plan assets grow the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.  And that is exactly what happened here.

76.     As demonstrated in the charts below, using a fixed percentage of assets to determine recordkeeping and administrative costs resulted in a worst-case scenario for the Plans' participants because it saddled the Plans' participants with above-market administrative and recordkeeping fees throughout the Class Period.  Notably, even though the Revenue Requirement decreased over the years it couldn't keep pace with the growth of Plan assets.

77.

78.     The Plans' per participant administrative and recordkeeping fees were as follows:

| Year | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| Assets | $2.509B | $2.245B | $1.865B | $1.985B | $1.708B |
| Asset Based Fee | 0.039% | 0.039% | 0.039% | 0.07% | 0.10% |
| Total Fee | 978,734 | 876,874 | 727,402 | 1,389,940 | 1,708,185 |
| Participants | 12366 | 14426 | 12125 | 11145 | 10798 |
| PP Cost | $79.15 | $60.78 | $59.99 | $124.71 | $158.19 |

| Year | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| Assets | $4.545B | $4.110B | $3.438B | $3.643B | $3.129B |
| Asset Based Fee | 0.039% | 0.039% | 0.039% | 0.07% | 0.10% |
| Total Fee | $1,772,687 | $1,603,107 | $1,341,156 | $2,550,577 | $3,129,448 |
| Participants | 12225 | 16933 | 16684 | 14336 | 14190 |
| PP Cost | $145.01 | $94.67 | $80.39 | $177.91 | $220.54 |

79.     The above fees were astronomical when benchmarked against similar plans.

80.     During the Class Period, the combined Plans had over 20,000 participants with account balances at all times, making them eligible for some of the lowest fees on the market.

81.     The recordkeeping was performed throughout the Class Period by both Fidelity and TIAA, as discussed above.

82.     Let's start with what Fidelity itself would pay if it were in Defendants' shoes. In a recent lawsuit where Fidelity's multi-billion dollar plan with over fifteen thousand participants was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020).

83.     Specifically, Fidelity stipulated as follows:

The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that *Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year*. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

84.     The key here is that Fidelity served as the Plans' recordkeeper during the same time period when Fidelity admitted its own plan didn't offer services broader or more valuable than any of the plans it served.  Moreover, Fidelity stated it is familiar with plans negotiating for "fixed fee" amounts.  Accordingly, the Mitre Plan fiduciaries could plausibly have negotiated for RKA costs as low as $17 beginning in 2015 when the Plans had a combined 23,000 participants with account balances to $14 by 2017 according to the scale set forth in the aforementioned Fidelity stipulation.

85.     This is especially true for two additional reasons.  First, Fidelity and TIAA derived benefit from the Plans' managed account service.  Second, the Plans offered several Fidelity mutual funds in their menu, a factor which should have led to further discounting of the recordkeeping and administration costs.

86.     Looking at recordkeeping costs for plans of differing sizes illustrates the imprudence of Defendants' actions.  Remember, the larger the number of participants, the lesser the per participant RKA costs should be because of the economies of scale.   Using 2018 as an exemplar year, indicative of the other years of the Class Period, shows that the Plans were paying higher recordkeeping fees than plans with less plan participants as well as plans with the same relative number of plan participants.  Each of the plans below had conservatively more than 13,000

participants with assets between approximately $300 million dollars to a billion dollars or more in assets under management:

| Plan | Participants[10] | Net Assets[11] | PP Fee[12] | Recordkeeper |
|------|------|------|------|------|
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $35 | Fidelity |
| The Tax Sheltered Annuity Plan of Texas Children's Hospital | 13,950 | $993,649,270 | $30 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $33 | Fidelity |
| Fed Ex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | $30 | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $26 | Great-West |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | $25 | Great-West |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,552,720,874 | $23 | T.Rowe Price |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $33 | Alight |
| Danaher Corporation & Subsidiaries Savings Plan | 33,116 | $5,228,805,794 | $34 | Fidelity |

[10] Participants are taken from the 2018 Form 5500 using the conservative number of only those participants with account balances at the year end. It is also generally accepted that RKA per participant is based on accounts with balances.

[11] Assets under management are taken from the 2018 Form 5500 using the more conservative number found in the accompanying audited financial statements. In some cases, this number may be understated minimally to account for differences in auditing practices.

[12] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2020) at pg. 27 (defining each service code), *available* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2020-instructions.pdf at 27. The plans selected here used funds that included either little or no revenue sharing thus making any indirect compensation inconsequential.

Five of the above plans were plans where Fidelity was the recordkeeper and charged no more than $35 per participant.

87.     These figures remain consistent over the span of the Class Period.  From 2013 to 2019, there were plans ranging in size from 3,000 participants to over 18,000 participants that paid less than the Plan.  The below chart reflects fees paid by these plans for recordkeeping and administration costs.  As noted in footnote 12, the plans selected here used funds that included either little or no revenue sharing thus making any indirect compensation inconsequential. Because of economies of scale, the Plan's fiduciaries should have been able to negotiate per participant RKA costs less than the plans below paid.

| Year | Plan Name | Assets | Participants | Part Fee | Recordkeeper |
|------|-----------|--------|--------------|----------|--------------|
| 2013 | Wrigley Savings Plan | $446 million | 3,146 | $26.69 | Mercer HR Services, LLC |
| 2014 | Wrigley Savings Plan | $449 million | 3,132 | $29.21 | Mercer HR Services, LLC |
| 2014 | HealthFirst Profit Sharing 401(k) | $123 million | 3,732 | $32.74 | Verisight, Inc. |
| 2018 | Bausch Health Companies Inc. Retirement Savings Plan | $904,717,349 | 8,902 | $36 | Fidelity |
| 2018 | Children's Medical Center of Dallas Employee Savings Plan 403(b) | $349,335,673 | 9,356 | $36 | Fidelity |
| 2018 | Ralph Lauren 401(k) Plan | $552,586,935 | 9,389 | $31 | T.Rowe |
| 2018 | Vibra Healthcare Retirement Plan | $107,652,510 | 9,750 | $28 | Great-West |

| Year | Plan Name | Assets | Participants | Part Fee | Recordkeeper |
|------|-----------|--------|--------------|----------|--------------|
| 2018 | Republic National 401(k) | $671,989,839 | 9,922 | $33 | Great-West |
| 2018 | Southern California Permanente Medical Group Tax Savings Retirement Plan | $773,795,904 | 10,770 | $31 | Vanguard |
| 2019 | Pacific Architects and Engineers, LLC 401(k) Savings Plan | $435,391,716 | 14,698 | $23 | Fidelity |
| 2019 | First American Financial Corporation 401(K) Savings Plan | $1,791,281,396 | 15,246 | $35 | Fidelity |

88.     Thus, the Plans, with over 28,000 participants should have been able to negotiate a recordkeeping costs ranging from $14 to the low $30 range from the beginning of the Class Period to the present. Anything above that would be an outlier especially later in the Class Period when RKA costs per participant should have been at the cheapest.[13]

89.     Further, NEPC, a consulting group, recently conducted its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[14]   The sample size and respondents included 121 Defined Contribution

---

[13] *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

[14] Available at https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  *See* Report at 1.

90.     NEPC's survey found that the majority of plans with over 15,000 participants, to use a conservative number, paid slightly over $40 per participant recordkeeping, trust and custody fees.  Report at 10.  The worst performing plans reviewed by the NEPC with over 15,000 participants paid no more than $60 per participant, but, clearly MITRE should have been able to negotiate a fee well below this mark given that the economies of scale works in favor of a plan with participants far exceeding 15,000 participants. *Id.*

91.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

92.     A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2020

Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

93.     The fact that the Plans have stayed with the same recordkeeper, namely TIAA and Fidelity since 2006, paid an increasing amount in recordkeeping fees from 2018 to the present, and paid outrageous amounts for recordkeeping from 2015 (before the start of the Class Period) to 2017 (nearly **5x** the amount similarly-situated plans paid), there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2016 through the present - to determine whether the Plans could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

94.     Given the size of the Plans' assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plans could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plans' recordkeeper at a lower cost.

### C. Utilizing Higher Cost Share Classes of Identical Funds to Pay for Recordkeeping Was Imprudent

95.     Another indication of Defendants' flawed Plan expense monitoring process resulted in the failure to identify and utilize available lower-cost share classes of many of the funds in the Plans during the Class Period.

96.     Pursuant to the Record Keeping Agreement, "Where the Employer with respect to a Plan maintains a balance in and makes active contributions to any of the mutual funds, other investment vehicles, and/or TIAA-CREF annuity contracts recordkept on TIAA's platform, TIAA will compare the Revenue Requirement to the revenue generated by such Plan on a quarterly basis to determine if the Plan generated sufficient revenue to meet TIAA's Revenue Requirement."

Record Keeping Services Agreement, Amendment No. 11 at 1.  Excess amounts were placed in a Revenue Credit Account, except if the excess amount was "less than $2,500" for any given year. *Id.* at 2.

97.     Here, using additional revenue sharing to pay for over-priced Recordkeeping services cost participants out-of-pocket money which compounded over time leaving participants with significantly less for their retirement.  First, they suffered lost opportunity costs with regard to the money that was in excess of the Revenue Requirement.  Second, they lost opportunity costs with regard to the overpriced Revenue Requirement.

98.     "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.  "Beneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198.

99.     During the Class Period, MITRE maintained many funds in the Plans which had significant expense ratios above a standard fund management fee.  This excess expense is the aforementioned revenue sharing.

100.     As an example of one of these funds in the Plans, in 2021, the Plans offered the Cohen and Steers Real Estate Securities A which has a published expense ratio of 1.12%. The "A" at the end of this fund indicates it's the retail version of the fund. The Plans which had more than $7 billion dollars in assets under management in 2021, should have been able to easily qualify for the institutional share of this particular fund. The institutional version is known as the Cohen and Steers Real Estate Securities I and has an expense ratio of only 0.86%. The difference between the 1.12% expense ratio of the A Class and the 0.86% expense ratio of the I Class is considered revenue sharing and is what MITRE used to pay its excessive recordkeeping costs.

101.    In addition, the Fidelity Freedom 2020 K and the Fidelity Freedom K 2030 funds, which were invested in by the proposed Class representatives, discussed above, also had a lower share class available, namely the K6 shares. The published expense ratios, in 2021, for the Fidelity Freedom 2020 K and the Fidelity Freedom K 2030 funds were 0.60% and 0.68%, respectively, while the published rate for the K6 shares of the identical funds were 0.44% and 0.47%, respectively. These are only some examples of what is believed to be in the neighborhood of 100 from the over 400 funds which were in the Plans for most years of the Class Period as described in Appendix A.

102.    Additionally, it would appear that the MITRE did the opposite of what's required of a prudent fiduciary. Instead of seeking to lower the amount of revenue sharing in the Plans, MITRE instead increased it to cover the already excessively high asset based administrative and recordkeeping fees. To provide just one example, in 2020, the Plans moved from the institutional classes of the Fidelity Freedom Index target date funds having an expense ratio of only 0.12% to a much more expensive line up of target date funds which paid additional revenue sharing so the Plans could afford the excessively high asset based administrative and recordkeeping fees. In particular, in 2021, the Plans moved to the retail versions of Fidelity target date funds, which cost plan participants an additional expense of between .20% and .25%.  The Defendants should have sought to reduce the overall recordkeeping and administrative expense rather than seek to increase the Plans' revenue sharing to pay for it.

103.    Because Plan participants were paying more for recordkeeping than they should have as a result of the Plan fiduciaries' conduct, this confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay recordkeeping and administrative costs via revenue sharing.  The selection of higher-cost share classes such as the ones identified in the paragraph above was thus imprudent.

104.    The use of higher cost share classes of Plan funds, including the addition of required revenue to the Plans' funds, caused millions of dollars of damages for the Plan and its participants.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

105.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

106.    At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

107.    As fiduciaries of the Plans, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

108.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Prudence Defendants failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plans and imprudently utilized a required revenue structure to pay for RKA costs.

109.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

110.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

111.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against MITRE and the Board Defendants)**

112.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

113.    MITRE and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plans.

114.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Committee Defendants were not fulfilling those duties.

115.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on

which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Monitoring Defendants.

116.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

        (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

        (b)    failing to monitor the processes by which Plans investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

        (c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans, all to the detriment of the Plans and Plans' participants' retirement savings.

117.    As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

118.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plans all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as a Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment

of an independent fiduciary or fiduciaries to run the Plans and removal of Plans' fiduciaries deemed to have breached their fiduciary duties;

      I.      An award of pre-judgment interest;

      J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

      K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

      L.      Such other and further relief as the Court deems equitable and just.

Date: June 22, 2022

**THE LAW OFFICE OF JEFFREY HELLMAN, LLC**

*/s/ Jeffrey Hellman*
Jeffrey Hellman, Esquire
BBO #549896
195 Church Street, 10th Floor
New Haven, CT 06510
Email: jeff@jeffhellmanlaw.com
Telephone: (203) 691-8762
Fax: (203) 823-4401
Local Rule 83.1(c) Counsel

**CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey*
Donald R. Reavey, Esquire
PA Attorney ID #82498
(*Admission Pro Hac Vice to be Requested*)
2933 North Front Street
Harrisburg, PA 17110
Email: donr@capozziadler.com
Telephone: (717) 233-4101
Fax: (717) 233-4103

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Admission Pro Hac Vice to be Requested*)
Gabrielle Kelerchian, Esquire
PA Attorney ID # 324248
(*Admission Pro Hac Vice to be Requested*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road

Merion Station, PA 19066
Email: markg@capozziadler.com
Email: gabriellek@capozziadler.com
Telephone: (610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class