**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **AARON L. BROWN et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 22-cv-10976-DJC** |
| **THE MITRE CORPORATION et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, J.**                                                               **March 6, 2023**

## I.      Introduction

Plaintiffs Aaron Brown ("Brown"), Peter Young ("Young"), Nina Daniel ("Daniel"), Kimberly Nesbitt "(Nesbitt"), Russell Crabtree ("Crabtree") and Erin Wheeler ("Wheeler"), on behalf of themselves and a purported class (collectively, "Plaintiffs") have filed this lawsuit against The MITRE Corporation, its Board of Trustees and its Investment Advisory Committee (collectively, "Defendants") and John Doe defendants 1-30 for alleged breach of fiduciary duty of prudence to participants in MITRE retirement plans (Count I) and "failure to adequately monitor other fiduciaries" (Count II) in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132.  D. 1.  Before the Court is Defendants' motion to dismiss.  D. 16.  For the reasons set forth below, the Court ALLOWS the motion as to Plaintiff Brown and DENIES it as to both Count I and II as asserted by the other Plaintiffs.

## II.     Standard of Review

A defendant may move to dismiss for a plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To withstand a Rule 12(b)(6) challenge, the Court must determine if the complaint "plausibly narrate[s] a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citing Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011)).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (citation omitted).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id. (citing Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id. (citing Morales-Cruz, 676 F.3d at 224).  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face."  García-Catalán, 734 F.3d at 103 (quoting Iqbal, 556 U.S. at 678).

## III.     Factual Background

The following facts are drawn from Plaintiffs' complaint, D. 1, and are accepted as true for the consideration of the pending motion to dismiss.

The MITRE Corporation ("MITRE") is a not-for-profit organization that sponsors, and is a named fiduciary for the Tax Sheltered Annuity Plan ("the TSA") and the Qualified Retirement Plan ("the QRP") (collectively, "the Plans").  D. 1 ¶ 28.  The TSA is intended to qualify under Section 403(b) of the Internal Revenue Code, while the QRP is intended to qualify under Section

401(a).  Id. ¶ 46.  Regular full-time employees of MITRE are generally eligible to participate in the Plans, which provide retirement benefits based solely on the amounts allocated to each individual's account.  Id. ¶¶ 46–48.  Plaintiffs are individuals who participated and invested in the options offered by one or both of the Plans during their employment at MITRE.  See id. ¶¶ 20–25.  MITRE, acting through its Board of Trustees ("the Board"), appointed its Investment Advisory Committee ("the Committee") to, among other things, ensure that the investments available to the Plans' participants were appropriate, had no more expenses than reasonable and performed well as compared to their peers.  Id. ¶¶ 29, 32, 35.

At all times since June 22, 2016 ("the Class Period"), the Plans combined had at least $3.5 billion dollars in assets under management that were entrusted to the care of the Plans' fiduciaries.  See id. at 2 n.2 & ¶ 10.  The Plans' assets under management, among the largest in the United States, qualified them as "jumbo plans" in the defined contribution plan marketplace.  Id. ¶ 11.  From 2016 to 2020, the QRP had between 10,798 and 12,366 participants with account balances and the TSA had between 12,225 and 14,190 participants with account balances.  Id. ¶ 12.  Combined, the Plans had over 20,000 participants with account balances during the Class Period.  Id.  In 2020, there were 198 defined contribution plans (401k, 401a and 403b) in the country with 15,000 to 19,999 participants and 194 such plans with 20,000 to 29,999 participants.  Id.

Plan participants were required to pay recordkeeping or administrative service fees.  Id. ¶ 64.  The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Id. ¶ 65.  There are two types of essential recordkeeping services provided by all national recordkeepers for large plans.  Id. ¶ 66.  One option is an overall suite of recordkeeping services provided to large plans as part

of a "bundled" fee for an "all-you-can-eat" style service offered at one price regardless of the services chosen or utilized by a plan. Id. ¶¶ 66–67. The other option is an "a la carte" style service that often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. Id. ¶ 68. As jumbo plans, both in terms of assets and participants, the Plans had "substantial bargaining power regarding the fees and expenses that were charged against participants' investments." Id. ¶ 13. The Plans' "massive size in terms of the number of participants also afforded it the luxury to leverage its scale to obtain low recordkeeping and administration costs." Id.

MITRE had agreements with TIAA and Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") to provide recordkeeping services for the Plans beginning in 2006, through the Class Period. Id. ¶¶ 69–70, 93. TIAA provided recordkeeping services based on a percentage of the assets in the Plans ("the Revenue Requirement"). Id. ¶ 70. TIAA compared the Revenue Requirement to the revenue generated by the Plans on a quarterly basis to determine if the Plans generated sufficient revenue to meet the Revenue Requirement. Id. ¶ 96. In 2015, the Revenue Requirement was 0.10 basis points of the Plans' total assets, in 2016 it was 0.07 basis points and from 2018 through at least 2020 it was 0.039 basis points. Id. ¶ 71. Under the Agreement, the Revenue Requirement of 0.039 basis points will remain in effect until June 30, 2023. Id. The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Id. ¶ 72. Accordingly, large plans get lower effective rates per participant than smaller plans. Id.

In 2018, at least ten plans, ranging from 13,248 to 33,116 participants, paid between $23 to $35 per participant in recordkeeping fees to varying recordkeepers. Id. ¶ 86. By comparison, in 2018 the QRP and TSA Plans paid approximately $59 and $80, respectively. Id. ¶ 78.

Between 2013 to 2019, at least eleven plans, ranging in size from 3,146 to 15,246 participants, paid between $23 to $35 per participant in recordkeeping fees to varying recordkeepers.  Id. ¶ 87.  By comparison, between 2016 to 2020, the Plans paid between $60 to $220 per participant in record keeping fees.  Id. ¶ 78.  Additionally, in a 2020 survey of 121 plans, where the average plan had $1.1 billion in assets and 12,437 participants, the majority of them with over 15,000 participants paid a little over $40 per participant in recordkeeping, trust and custody fees.  Id. ¶¶ 89–90.

In 2021, the Plans offered the retail version of the Cohen and Steers Real Estate Securities fund (A Class), which has a published expense ratio of 1.12%.  Id. ¶ 100.  The institutional version of this fund, the Cohen and Steers Real Estate Securities I, had an expense ratio of 0.86%.  Id.  The difference between the two ratios is considered revenue sharing and is what MITRE used to pay its recordkeeping costs.  Id.  As another example, also in 2021, the Fidelity Freedom K 2020 and Fidelity Freedom K 2030 funds, which Plaintiffs invested in with expense ratios of 0.60% and 0.68%, respectively, also had lower share classes of the same funds available at 0.44% and 0.47%, respectively.  Id. ¶ 101.

## IV.     Procedural History

Plaintiffs commenced this action on June 22, 2022.  D. 1.  Defendants have moved to dismiss for failure to state a claim upon which relief can be granted.  D. 16.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 45.

## V.     Discussion

### A.     Fiduciary Duty of Prudence (Count I)

"ERISA provides that any person who exercises discretionary authority or control in the management or administration of an ERISA plan (or who is compensated in exchange for

investment advice) is a fiduciary." Barchock v. CVS Health Corp., 886 F.3d 43, 44 (1st Cir. 2018) (citing 29 U.S.C. § 1002(21)(A)). "ERISA further provides that such a fiduciary has a duty to act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" Id. (quoting 29 U.S.C. § 1104(a)(1)(B)). "[W]ith respect to whether a complaint states a claim of imprudence under ERISA, 'the appropriate inquiry will necessarily be context specific.'" Id.; see Hughes v. Nw. Univ., __ U.S. __, 142 S. Ct. 737, 740 (2022) (concluding that "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires"). "Therefore, to determine whether a fiduciary acted in accordance with its duty of prudence, a court will evaluate conduct under the 'totality of the circumstances' and assess a fiduciary's procedures, methodology and thoroughness." Sellers v. Trustees of Coll., No. 22-cv-10912-WGY, 2022 WL 17968685, at *5 (D. Mass. Dec. 27, 2022) (citing Barchock, 886 F.3d at 44; Glass Dimensions, Inc., ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co., 931 F. Supp. 2d 296, 305 (D. Mass. 2013)).

"Fiduciaries have a general duty to monitor recordkeeping expenses and, more generally, they have a prudential duty to be cost-conscious in the administration of a plan." Turner v. Schneider Elec. Holdings, Inc., 530 F. Supp. 3d 127, 136 (D. Mass. 2021) (citing Moitoso v. FMR LLC, 451 F. Supp. 3d 189, 213 (D. Mass. 2020)) (second citation omitted). "ERISA fiduciaries breach their duty of prudence by failing diligently to investigate and monitor recordkeeping expenses as well as other administrative expenses." Id. (citations and internal quotation marks omitted). Plaintiffs allege that Defendants, as a fiduciary of the Plans, breached its duty of prudence by causing Plaintiffs to incur unreasonable fees during the Class Period. D.

1 ¶¶ 14–16.  "Under the totality of the circumstances," <u>Sellers</u>, 2022 WL 17968685, at *5, the Court finds that the complaint's factual allegations are sufficient to state a plausible claim of imprudence.

### 1.    Revenue Sharing Approach

Plaintiffs allege that the Committee's use of "a revenue sharing approach," whereby a fixed percentage of the Plans' assets paid for recordkeeping fees, had a detrimental effect on participants' retirement savings.  D. 1 ¶¶ 73–74, 76.  Because of the large amount of assets held by the Plans, Plaintiffs contend that the Committee's decision to use this fixed percentage approach resulted in unreasonably high per participant fees ranging from approximately $60 to $220 between 2016 to 2020.  <u>See id.</u> ¶ 78, particularly in comparison to twenty-one plans, with either less or a similar number of plan participants as the Plans, that paid between $23 to $35 per participant in recordkeeping fees to varying recordkeepers between 2013 to 2019.  <u>See id.</u> ¶¶ 86–87.  Plaintiffs maintain that due to economies of scale, plans with large numbers of participants should pay less per participant than plans with fewer participants.  <u>Id.</u> ¶ 72.  In Plaintiffs' view, therefore, the Committee was imprudent because it failed to negotiate lower recordkeeping fees based on a fixed dollar amount rather than a fixed percentage of assets.  <u>Id.</u> ¶¶ 75–76.

Defendants argue that Plaintiffs' claims fail as a matter of law because the complaint offers no facts that the Plans' "fees were outside the range of fees other plans paid, or even that they were above average."  D. 17 at 14.  Defendants specifically take issue with Plaintiffs' "laser-like focus on cost" without regard to the extent and quality of services provided.  D. 17 at 12–13.  Defendants further argue that the First Circuit in <u>Barchock</u> "rejected these same sorts of fiduciary breach allegations based on these same types of comparisons."  <u>Id.</u> at 6.

As a preliminary matter, <u>Barchock</u> is distinguishable from the case at bar.  In <u>Barchock</u>, the plaintiffs sought to infer imprudence "solely from their complaint's charge that [a fiduciary's] cash-equivalent allocation 'departed radically' from both industry averages and the underlying financial logic of stable value management." <u>Barchock</u>, 886 F.3d at 52.  Notably, the plaintiffs in that case did not "directly criticize the process by which the Fund's investment allocation was selected" nor did the plaintiffs allege "that defendants had something to gain from managing the fund conservatively, which could raise doubts about the prudence of [the fiduciary's] investment process." <u>Id.</u> at 49 (internal quotation marks omitted).  Here, Plaintiffs "directly criticize the process" by which the Plans' investment allocation was elected.  <u>See id.</u> Specifically, Plaintiffs allege that Defendants failed to leverage its substantial bargaining power, due to the Plans' size, to obtain the same recordkeeping services at a lower cost.  D. 1 ¶¶ 66–69, 94.  This allegation is sufficient to give rise to the inference that the Defendants' "overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plans and the assets of participants." <u>Id.</u> ¶¶ 13, 63; <u>see</u> <u>Matousek v. MidAmerican Energy Co.</u>, 51 F.4th 274, 278 (8th Cir. 2022) (stating that "[a] plaintiff typically clears the pleading bar by alleging enough facts to '*infer* . . . that the process was flawed'") (citing <u>Davis v. Washington Univ. in St. Louis</u>, 960 F.3d 478, 482-83 (8th Cir. 2020)) (emphasis and omission in original).

Defendants also rely upon other cases for their position that Plaintiffs have not pleaded sufficient "facts relating to the specific services provided to the Plans (by either TIAA or Fidelity), let alone the services provided to their handful of proffered comparator plans." D. 30 at 2 & n.1 (citing <u>Matousek</u>, 51 F.4th at 278;  <u>Smith v. CommonSpirit Health</u>, 37 F.4th 1160 (6th Cir. 2022); <u>Albert v. Oshkosh Corp.</u>, 47 F.4th 570 (7th Cir. 2022)).

In <u>Matousek</u>, the defendants provided the court with sufficient allegations to allow it to identify the types of services provided by the recordkeeper and calculate the approximate fees for each type.  <u>Matousek</u>, 51 F.4th at 279 (using participant-disclosure forms to calculate fees of $32 to $48 per participant for "basic recordkeeping services").  The Court then compared the fees for those services to the industry-wide benchmarks proffered by the plaintiffs, concluding that the plan in question "compare[d] favorably" to the benchmarks.  <u>See</u> <u>id.</u>; <u>Rodriguez et al. v. Hy-Vee, Inc. et al.</u>, No. 22-cv-00072-SHLHCA, 2022 WL 16648825, at *11–12 (S.D. Iowa Oct. 21, 2022) (applying <u>Matousek</u> and concluding that the defendants did not give the court "enough information to understand the difference (if there is one) in the scope of recordkeeping services provided in connection with the [plan] versus those provided in the proffered benchmarks").  As in <u>Rodriguez</u>, here, the Court has no basis at this stage "to doubt the plausibility" of Plaintiffs' allegations that there are "two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plans)" and that "the Plans could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plans' recordkeeper at a lower cost."  D. 1 ¶¶ 66–69, 94; <u>see</u> <u>Rodriguez</u>, 2022 WL 16648825, at *12 (finding "no reason to doubt the plausibility of [the plaintiffs'] allegation that 'all' recordkeepers in large 401(k) plans provide the same suite of recordkeeping services, and thus the [plan] paid too much") (citing <u>Davis</u>, 960 F.3d at 483); <u>Garnick v. Wake Forest Univ. Baptist Med. Ctr.</u>, No. 21-cv-454, 2022 WL 4368188, at *8 (M.D.N.C. Sept. 21, 2022) (concluding that plaintiffs plausibly stated a claim of imprudence by alleging that plan had the leverage to bargain for more reasonable fees without utilizing revenue sharing).

Smith is distinguishable because, in that case, the plaintiff "failed to allege that the fees were excessive relative to the services rendered" and had, for example, compared a large plan's fees to "some of the smallest plans on the market." Smith, 37 F.4th at 1169 (citation and internal quotation marks omitted).  As discussed above, here, Plaintiffs have plausibly alleged that there are two types of recordkeeping services provided by all national recordkeepers for large plans and that the Committee failed to use its substantial bargaining power to obtain these same services at a lower cost.  D. 1 ¶¶ 66–69, 94; cf. Forman v. TriHealth, Inc., 40 F.4th 443, 449 (6th Cir. 2022) (concluding that plaintiffs failed to state a claim as to "overall plan fees" where "the employees never alleged that these fees were high in relation to the services that the plan provided").  Furthermore, given that the Plans each had approximately 10,000 to 14,000 participants throughout the Class Period and the complaint includes over ten comparator plans of similar sizes, see D. 1 ¶¶ 12, 86–87, unlike in Smith, Plaintiffs here have compared the Plans' fees to a sufficient number of similarly-sized plans.  See Peck v. Munson Healthcare et al., 2022 WL 17260807, at *6 (W.D. Mich. Nov. 9, 2022) (rejecting defendants' reliance on Smith because plaintiff "compared sufficiently similar plans for the purpose of stating a claim under ERISA").

Finally, Albert can be distinguished because, there, the plaintiff's recordkeeping claim was based on the allegation that the fiduciary "fail[ed] to regularly solicit quotes and/or competitive bids." Albert, 47 F.4th at 579.  Although the court concluded that the plaintiff failed to allege that the recordkeeping fees were excessive relative to the services rendered, id. at 580 (citing Smith, 40 F.4th at 449), the plaintiff in Albert does not appear to have alleged, as Plaintiffs do here, that there are two types of recordkeeping services provided by all national recordkeepers for large plans and that the fiduciary failed to use its substantial bargaining power

10

to obtain these same services at a lower cost.  See D. 1 ¶¶ 66–69, 94.  As the Albert court noted, "recordkeeping claims in a future case could survive the 'context-sensitive scrutiny of a complaint's allegations' courts perform on a motion to dismiss should it 'provide the kind of context that could move this claim from possibility to plausibility.'"  47 F.4th at 580 (citing Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 425 (2014); Smith, 37 F.4th at 1169).

Although there are rulings from other Circuits to consider, the First Circuit has not "foreclosed plaintiffs' complaint."  Adams et al. v. Dartmouth-Hitchcock Clinic et al., No. 22-cv-00099-LM, D. 33 (D.N.H. Feb. 10, 2023) (acknowledging the holdings in Matousek, Albert and Smith but denying motion to dismiss).  For one example in this Circuit, a group of plaintiffs provided sufficient context for their recordkeeping claim to survive a motion to dismiss in another session of this court.  Coviello et al v. BHS Management Services, Inc. et al., No. 20-cv-30198-MGM, D. 77 (D. Mass. June 9, 2022).[1]  The court then, noting that the defendants' "issue with plaintiffs' lack of factual specificity," concluded that the plaintiffs' allegations, including the allegation that "[d]espite the [p]lan's large size . . . [d]efendants saddled [p]lan participants with above-market recordkeeping fees and comparatively high investment management fees benchmarked against similar and even smaller plans" stated a claim of imprudence.  Coviello,

---

[1] Since the hearing on the pending motion, the parties have submitted multiple supplemental notices of authority addressing similar allegations.  D. 49; D. 53; D. 56.  As these notices indicate, district courts around the country have addressed such claims with mixed results.  See, e.g., Singh v. Deloitte LLP, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) (dismissing complaint); Probst v. Eli Lilly and Company, 2023 WL 1782611, at *9-12 (S.D. Ind. Feb. 3, 2023) (dismissing complaint); McNeilly et al. v. Spectrum Health Systems, et al., No. 20-cv-00870, D. 62 (W.D. Mich. Dec. 20, 2022) (denying motion to dismiss); In re Sutter Health ERISA Litig., No. 20-cv-01007-JLT, 2023 WL 1868865, at *10 (E.D. Cal. Feb. 9, 2023) (denying motion to dismiss); Adams, No. 22-cv-00099-LM, D. 33 (same).  Having considered these authorities, the Court finds persuasive the reasoning of other  sessions of this Court that have allowed complaints that are substantially like this complaint to proceed.  See Coviello, No. 20-cv-30198-MGM, D. 77; Sellers, 2022 WL 17968685, at *6–7; Turner v. Schneider Elec. Holdings, 530 F. Supp. 3d 127, 136-37 (D. Mass. 2021).

20-cv-30198-MGM, D. 77 (internal quotation marks omitted).   As discussed above, here,
Plaintiffs have made comparable allegations regarding the Plan's failure to leverage its size to
obtain lower recordkeeping fees for the same services.   See In re Sutter Health, 2023 WL
1868865, at \*10 (ruling that it was sufficient at the motion to dismiss stage for plaintiffs to allege
specific facts supporting their claims that the a plan's fees and total cost were excessive for its
size); see also Ybarra v. Bd. of Trustees of Supplemental Income Tr. Fund, 2018 WL 9536641,
at \*4 (C.D. Cal. Nov. 5, 2018) (stating that the court must take plaintiffs' factual allegations as
true, including the claim that $40 would be a reasonable recordkeeping fee, particularly where
plaintiffs "attack the Plan's method for selection not merely the difference between retail and
institutional class funds").

Accordingly, the Court finds that Plaintiffs' revenue sharing allegations are sufficient to
infer imprudence.

### 2.   Failure to Solicit RFPs

Plaintiffs also plausibly allege that the Committee was imprudent because it did not
conduct a Request for Proposal ("RFP") at reasonable intervals.   See D. ¶ 93.   "Failure to
conduct RFPs further demonstrates a plausible breach of the duty of prudence by" a fiduciary.
Sellers, 2022 WL 17968685, at \*7 (citing Turner v. Schneider Elec. Holdings, Inc., 530 F. Supp.
3d 127, 137 (D. Mass. 2021); Tracey v. Massachusetts Inst. of Tech., No. CV 16-11620-NMG,
2017 WL 4478239, at \*3 (D. Mass. Oct. 4, 2017)).   In Sellers, the plaintiffs alleged that a plan
fiduciary "failed to look externally to the marketplace to determine what comparable plans are
paying their service providers to help in determining a reasonable recordkeeping fee."   Id.   Here,
given that the Plans remained with the same two recordkeepers for at least fourteen years despite
an alleged increase in recordkeeping costs, it is plausible that the Committee was imprudent for

not conducting an RFP at reasonable intervals during that time period.  See id. ¶ 93; Turner, 530

F. Supp. 3d at 137 (concluding that allegations that a fiduciary "did not solicit competitive bids

for managed account services and subsequently failed to monitor and control the fees for such

services . . . adequately state[d] a claim for a breach of fiduciary duty"); see also George v. Kraft

Foods Glob., Inc., 641 F.3d 786, 800 (7th Cir. 2011) (holding that "a trier of fact could

reasonably conclude that defendants did not satisfy their duty to ensure that [recordkeeper's] fees

were reasonable" where plan fiduciaries failed to solicit competitive bidding for more than

fifteen years); Kendall v. Pharm. Prod. Dev., LLC, No. 7:20-cv-71-D, 2021 WL 1231415, at *10

(E.D.N.C. Mar. 31, 2021) (noting that a "plan fiduciary's failure to reduce recordkeeping costs

through negotiation or the solicitation of competing bids may in some cases breach the duty of

prudence") (citation and internal quotation marks omitted); cf. White v. Chevron Corp., No. 16-

cv-0793-PJH, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (dismissing claim of breach

of fiduciary duty under ERISA and noting that plaintiffs did not allege that a competitive bid

would have benefited a plan and its participants "because they do not allege any facts from

which one could infer that the same services were available for less on the market").

Accordingly, the Court finds that Plaintiffs' allegations that the Committee failed to

conduct an RFP at reasonable intervals are sufficient to infer imprudence.

### 3.    Retention of Multiple Recordkeepers

Plaintiffs also plausibly allege that the Committee's decision to retain multiple

recordkeepers caused the Plans to incur excessive fees.  D. 1 ¶ 74 (alleging that the Plans could

not take advantage of its economies of scale to get the best possible record-keeping fees by

utilizing two recordkeepers, "a job which is traditionally handled by only one").  Id.  A

fiduciary's decision to retain multiple recordkeepers may give rise to an inference of

13

imprudence.  See, e.g., Santiago v. Univ. of Miami, No. 20-cv-21784, 2021 WL 1173164, at *5 (S.D. Fla. Mar. 1, 2021) (denying motion to dismiss where plaintiffs alleged that "it is well known that plans with multiple record keepers causes high investment and administrative costs and that the market rate for such fees are $35 per participant, and here, participants had paid an excess of $100 in fees"); Henderson v. Emory Univ., 252 F. Supp. 3d 1344, 1353 (N.D. Ga. 2017) (denying a motion to dismiss and explaining that plaintiffs had sufficiently alleged a breach of fiduciary duty of prudence by alleging that "[d]efendants have continued to contract with three separate recordkeepers" and that this caused plan participants to pay excessive and unreasonable recordkeeping and administrative fees).

While the Committee's use of two recordkeepers alone is not sufficient to state a claim of imprudence, see Divane v. Nw. Univ., 953 F.3d 980, 990 (7th Cir. 2020), vacated on other grounds and remanded sub nom. Hughes v. Nw. Univ., 142 S. Ct. 737 (2022), the Court finds, in light of the complaint's other allegations, that the use of the same two recordkeepers for at least fourteen years despite relatively high recordkeeping fees is sufficient to infer imprudence.

### 4.      Use of Higher Cost Share Classes of Identical Funds

Plaintiffs also plausibly allege that the Committee breached its duty of prudence by failing to investigate the availability of lower-cost share classes of certain mutual funds in the Plans.  D. 1 ¶¶ 99–104, 108.  "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones."  Tibble v. Edison Int'l, 575 U.S. 523, 530 (2015).  "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund."  Turner, 530 F. Supp. 3d at 136 (quoting Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009)) (internal quotation marks omitted).  Nevertheless, "cost-conscious management is fundamental to prudence in the investment

14

function." Id. (citing Tibble v. Edison Int'l, 843 F.3d 1187, 1197–98 (9th Cir. 2016)) (internal quotation marks omitted). Accordingly, "[c]ourts have found that plaintiffs stated a claim for breach of fiduciary duty where the chosen investments were more expensive than other available funds." Id.; see Jones v. Coca-Cola Consol., Inc., No. 320CV00654FDWDSC, 2021 WL 1226551, at *5 (W.D.N.C. Mar. 31, 2021) (ruling that plaintiffs' allegations regarding defendants' alleged failure to utilize cheaper investments that offered identical underlying investments stated a claim for breach of fiduciary duty); Smith v. Shoe Show, Inc., No. 20-cv-813, 2022 WL 583569, at *6 (M.D.N.C. Feb. 25, 2022) (noting that if a lower cost alternative is identical and offers the same benefits as the higher cost fund, then a plausible breach of a plan fiduciary's duty of prudence has been alleged) (citation omitted).

According to Plaintiffs, the Committee "maintained many funds in the Plans which had significant expense ratios above a standard fund management fee" to pay for "over-priced" recordkeeping services through revenue sharing. D. 1 ¶¶ 97, 99. Plaintiffs allege that the Committee decided to invest in the more expensive versions of at least three funds—Cohen and Steers Real Estate Securities A, Fidelity Freedom 2020 K and Fidelity Freedom K 2030—even though less expensive versions of these funds were available. Id. ¶¶ 100–102. Plaintiffs further allege that "[t]he use of higher cost share classes of Plan funds, including the addition of required revenue to the Plans' funds, caused millions of dollars of damages for the Plan and its participants." Id. ¶ 104.

These allegations are sufficient to infer that the Committee was imprudent. See Sellers, 2022 WL 17968685, at *8-9 (determining that similar allegations, when combined with other plausible allegations of unreasonable recordkeeping fees, were sufficient to state a claim of imprudence); see also Smith, 2022 WL 583569, at *6 (denying motion to dismiss where

plaintiffs alleged that defendants offered share classes that were composed of the same underlying investments as funds with lower cost structures and accepting as true plaintiff's allegation that revenue sharing was a detriment that did not justify the more expensive shares). While alleging that a fiduciary selected a more expensive version of a fund is insufficient alone, see Sellers, 2022 WL 17968685, at *8, such allegations, when combined with other plausible allegations that a fiduciary caused plan participants to pay excessive recordkeeping fees, is sufficient to state a claim of imprudence. See id. at *9. As discussed above, Plaintiffs have made several plausible allegations that the Committee breached the duty of prudence by causing them to pay excessive recordkeeping fees. See D. 1 ¶¶ 73–74, 76, 104.

For all of these reasons, the Court denies Defendants' motion to dismiss Count I.

## B. Failure to Monitor (Count II)

Plaintiffs allege that MITRE and the Board breached their fiduciary monitoring duties by, *inter alia*, "[f]ailing to monitor and evaluate the performance of the Committee . . . to the detriment of the Plans and Plans' participants' retirement savings." Id. ¶ 116.

> . . . ERISA Sections 409 and 502 require monitoring fiduciaries to ensure that fiduciaries are satisfying their obligations. These obligations include those with respect to investment selections, monitoring of service providers, and compliance with plan documents. Monitoring fiduciaries are required to act promptly to protect plans, participants, and beneficiaries when monitored fiduciaries breach their own obligations.

Sellers, 2022 WL 17968685, at *15 (citing 29 U.S.C. §§ 1109(a); 29 U.S.C. §§ 1132(a)(2), 1132(a)(3)). "To the extent that plaintiffs have plausibly alleged that defendants breached their fiduciary duties directly, plaintiffs have also plausibly alleged that defendants have breached their duty to monitor." Id. Here, given that the Court has already determined that Plaintiffs alleged sufficient facts to infer that Defendants breached the duty of prudence, the Court concludes that Plaintiffs have also plausibly alleged that they breached their monitoring duties.

16

Accordingly, the Court denies Defendants' motion to dismiss Count II.

### C.       Plaintiff Aaron Brown's Article III Standing

Defendants argue that Plaintiff Aaron Brown ("Brown") is barred from pressing his claims in this action because he previously filed an action against Defendants for similar claims that was dismissed for lack of subject matter jurisdiction based on standing in Brown v. The MITRE Corp. et al., No. 21-cv-11605-RGS, D. 32 (D. Mass. April 28, 2022).  The Court agrees that the doctrine of issue preclusion bars Brown's claim.

Issue preclusion or collateral estoppel "bar[s] relitigation of an issue decided in an earlier action where: (1) the issues raised in the two actions are the same; (2) the issue was actually litigated in the earlier action; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was necessary to that judgment." Manganella v. Evanston Ins. Co., 700 F.3d 585, 591 (1st Cir. 2012) (citations omitted).  Plaintiffs rely on Pace v. Town of Erving, 294 F. Supp. 3d 5, 8 (D. Mass. 2018) to argue that "dismissal for lack of subject matter jurisdiction permits a second action on the same claim that corrects the deficiency found in the first action." D. 20 at 28.  Pace, however involved rejecting that a plaintiff's claim was barred by res judicata where his initial case was dismissed for lack of subject matter jurisdiction for failure to exhaust the administrative process.  Pace, 294 F. Supp. 3d at 8.  That case does not change  the rule that dismissal for lack of subject matter jurisdiction "precludes relitigation of the issues determined in ruling on the jurisdictional question." Muniz Cortes v. Intermedics, Inc., 229 F.3d 12, 14 (1st Cir. 2000) (noting that "even assuming arguendo that res judicata does not bar the federal district court from adjudicating appellants' claims, the doctrine of collateral estoppel prevents the court from rehearing the *issue* of preemption") (emphasis in original).

Article III standing requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). Furthermore, a named plaintiff in representative ERISA claims must himself have a "concrete stake" in the outcome of the lawsuit. Thole v. U. S. Bank N.A., __ U.S. __, 140 S. Ct. 1615, 1619 (2020); see Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005) (stating "[t]he prudential aspects of standing include, among other things, 'the general prohibition on a litigant's raising another person's legal rights'") (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). Applying these standards, another session of this Court (Stearns, J.) determined that Brown had not established Article III standing because he had invested only in a single fund in the relevant time period, which "belonged to the lowest cost class, and critically, paid no revenue-sharing fees (facts not disputed in Brown's opposition). Brown's theory of damages, premised on the revenue sharing model, cannot explain how he was personally injured by MITRE's allegedly unreasonable fee practices." Brown, No. 21-cv-11605-RGS, D. 32. Accordingly, the court "actually" and "necessar[ily]" determined the issue of Brown's Article III standing in its order of dismissal. See id.; Manganella, 700 F.3d at 591. Given this prior dismissal, issue preclusion bars "relitigation of the issues determined in ruling on the jurisdictional question"—namely, whether Brown satisfies the Article III standing requirements based upon the facts alleged in his prior complaint. See Muñiz Cortes, 229 F.3d at 14.

Accordingly, the Court allows Defendants' motion to dismiss as to Brown.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss, D. 16, as to Plaintiff Aaron Brown and DENIES the motion as to all other Plaintiffs.

19

**So Ordered.**

/s/ Denise J. Casper
United States District Judge